**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

GENEVA FRANCE, et al.               )
                                    )       CASE NO. 1:07CV3519
        Plaintiffs,                 )
                                    )
        v.                          )       JUDGE DONALD C. NUGENT
                                    )
LEE LUCAS, et al.,                  )
                                    )       **MEMORANDUM OPINION**
                                    )       **AND ORDER**
        Defendants.                 )

        This matter is before the Court on two dispositive motions: (1) the Motion of Defendant

Richland County for Summary Judgment on Plaintiffs' *Monell* Claims (ECF #167); and (2)

Defendant Charles Metcalf's Motion for Summary Judgment on the claims of Plaintiff Lowestco

Ballard (ECF #168).  Plaintiffs have responded to the Motions (*see* Plaintiffs' Response in

Opposition to Defendants' Motions for Summary Judgment (ECF #194))[1], and Defendants have

replied (*see* ECF #s 196, 197).  Thus, the Motions are ripe for consideration.

        Defendants have met their burden to show that no issue of fact remains for a jury to

decide concerning Plaintiffs' *Monell* claims and the claims of Plaintiff Ballard.  Thus, for the

reasons explained below, the dispositive motions are GRANTED.

## I.  FACTS

        As explained in the Court's previous Memorandum Opinion and Order (ECF #151),

_____

        [1]Prior to discovery, Plaintiffs filed an Interim Response in Opposition to Defendants'
Motions for Summary Judgment (ECF #171).  Following discovery, Plaintiffs substituted the
Response under consideration here (ECF #194) in place of the Interim Response.

Plaintiffs Geneva France, Lowestco Ballard, Charmin Ballard, Tequerrea Ballard, Joe Ward II, Johnnie Parker, and Dwayne Nabors brought this civil rights action following a widespread investigation into the drug trade in Mansfield, Ohio.  Plaintiff France was arrested, tried, and convicted of two criminal drug charges arising from the Mansfield operation.  Plaintiffs Lowestco Ballard, Ward, and Parker were arrested, tried, and acquitted by a jury of drug charges. Plaintiff Nabors was arrested, tried, and acquitted at trial of one drug charge brought as the result of the Mansfield operation, and the jury deadlocked on a second drug charge.  Mr. Nabors was convicted on a firearm charge, however, and was sentenced to 60 months in prison.  Plaintiffs Charmin Ballard (who was married to Lowestco Ballard at all times relevant) and Tequerrea Ballard (Lowestco Ballard's daughter) were never investigated, arrested, nor charged with any offense.

The convictions and indictments against Plaintiffs that resulted from the Mansfield operation, dubbed "Operation Turnaround", were vacated and dismissed by the United States government following the guilty plea to various fabrication of evidence and other charges entered by Jerrell Bray, a confidential informant who actively participated in the Mansfield investigation and contributed information concerning targets of that investigation to law enforcement officials. Mr. Bray, while incarcerated for a 2007 drug-related shooting unrelated to Operation Turnaround, admitted to framing certain targets of the Mansfield operation by sometimes using stand-ins to stage drug transactions, or by passing off as his own drugs as having been purchased from individuals under investigation.  Mr. Bray admitted to framing Plaintiffs France and Nabors by using stand-ins during staged transactions.  He further admitted to framing Plaintiffs Ward and Parker by claiming that he had purchased from them drugs already in his possession.  Mr.

2

Bray's guilty plea did not implicate the charges brought against Lowestco Ballard.

After admitting to framing certain targets of Operation Turnaround, Mr. Bray testified at the federal criminal trial of Drug Enforcement Agency ("DEA") Special Agent Lee Lucas, one of the federal law enforcement officials in charge of the Mansfield operation.  The indictment in that case alleged that Special Agent Lucas knew of Mr. Bray's actions, covered up those actions, and testified falsely against many of the Mansfield defendants.  After a lengthy trial, at which Detective Metcalf testified for the government, a jury acquitted Special Agent Lucas of all charges.  Mr. Bray testified that no law enforcement officers, including Special Agent Lucas and Detective Metcalf, conspired with him to fabricate evidence against targets of the Mansfield operation.  Mr. Bray testified that he previously falsely reported a conspiracy between law enforcement and himself because he thought that it might somehow get him out of the trouble he faced after the 2007 shooting.  (*See* Case No. 1:08CV1253, ECF #76-2, p. 342.)

In May 2009, Detective Metcalf was charged with a criminal civil rights violation for his actions and testimony at the trial of Plaintiff Nabors.  *See* Case No. 1:09CR206 (Oliver, J.) Detective Metcalf pled guilty to presenting false evidence against Mr. Nabors at trial, and admitted that he falsely identified Mr. Nabors as a participant in a drug deal.

Following the federal government's dismissal of convictions and indictments against Plaintiffs stemming from Operation Turnaround, Plaintiffs brought this civil action asserting various civil rights violations against numerous defendants.  Certain defendants were dismissed as a result of settlement or by agreement.  (*See* ECF #s 142, 143, 151 fn. 3.)  Plaintiffs dismissed all claims under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), the Federal Tort Claims Act, 28 U.S.C. § 2671, and Ohio law.  (*See* ECF #s 142, 143, 151 fn. 9.)  Later, the Court

issued the Memorandum Opinion and Order (ECF #151) granting in their entirety motions for summary judgment on qualified immunity grounds filed by Richland County Sheriff's Office defendants Sergeant Matt Mayer, Captain Larry Faith, and Sheriff Steve Sheldon.

The Court further granted partial summary judgment to Richland County Sheriff's Office Detective Metcalf, finding that Defendant Metcalf is entitled to qualified immunity on the claims of all Plaintiffs excepting the false arrest, malicious prosecution, and fabrication of evidence claims of Plaintiffs Lowestco Ballard and Dwayne Nabors. Following the Court's ruling, the only claims remaining in the case are the Fourth Amendment false arrest/fabrication of evidence and malicious prosecution claims of Messrs. Ballard and Nabors against Defendant Metcalf, Plaintiffs' *Monell* claims against Richland County, and Plaintiffs' claims against Mr. Bray (who, apparently, is recently deceased).

On June 11, 2012, the Court issued an Order granting Plaintiffs until August 15, 2012 to complete discovery on the remaining claims in accordance with the Federal Rules of Civil Procedure, and to authenticate the documents already in their possession. (ECF #180.) The Court denied as excessive and unnecessary Plaintiffs' request for nine or more months in which to conduct discovery, given the vast amount of information already available to Plaintiffs. In that Order, the Court noted, as it had previously, that Plaintiffs already had in their position thousands of pages of documents, including the Plaintiffs' trial transcripts and the transcript from Special Agent Lucas' criminal trial.

Plaintiffs submitted their Response in Opposition to Defendants' Motion for Summary Judgment on August 24, 2012. Defendants replied on August 31, 2012.

The Court's prior Memorandum Opinion and Order (ECF #151) sets forth a detailed

recitation of the facts of this case.  Those facts are incorporated herein by reference.

## II.  <u>LEGAL STANDARD</u>

Defendants have moved for summary judgment on Plaintiffs' *Monell* claims (Richland County) and on the claims of Plaintiffs Ballard and Nabors (Detective Metcalf).  Summary judgment under Rule 56 is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party has the initial burden of proving that no genuine issue of material fact exists," and the court must draw all reasonable inferences in the light most favorable to the nonmoving party.  *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001).  When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

With regard to the non-moving party's obligation to set out specific facts showing a genuine issue for trial, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Williamson v. Aetna life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Rather, "Rule 56 allocates that duty to the opponent of the motion, which is required to point out the evidence, albeit evidence already in the record, that creates an issue of fact."  *Id*.

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the nonmoving party.  *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87.  The Court's inquiry, therefore, asks whether reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.  DISCUSSION

Plaintiffs' Opposition to the two summary judgment motions under consideration relies significantly on the purported facts presented in an affidavit sworn by Mr. Bray on July 11, 2012. There are serious questions about the admissibility of Mr. Bray's affidavit testimony at trial, considering Mr. Bray's apparent recent death.

Even putting aside questions of admissibility at trial, however, it is clear as an initial matter that the affidavit is not evidence that can be considered on summary judgment.  In an attempt to (1) overcome summary judgment on Plaintiffs' *Monell* claims and the claims of Messrs. Nabors and Ballard, and (2) revive Plaintiffs' conspiracy claims that the Court previously rejected (*see* ECF #151), Mr. Bray's affidavit is devoted to asserting that Richland County Sheriffs' Office employees Detective Metcalf, Matt Mayer, and Larry Faith, and DEA Special Agent Lucas, were aware that Mr. Bray was framing people, and actively assisted him in fabricating evidence against targets of Operation Turnaround.

Mr. Bray's affidavit is replete with assertions that Detective Metcalf and his colleagues knew about and participated in Mr. Bray's fabrications.  Paragraph three states in part, "None of the officers ever contacted any of my friends or contacts to arrange for them to deliver drugs. But Metcalf, Mayer, Faith, and Lucas definitely knew that the people we were identifying as the culprits were, in many cases, not the right people."  The next three paragraphs are dedicated to explaining why law enforcement officials "knew" of Mr. Bray's efforts to frame targets of

6

Operation Turnaround.

Paragraph 11 of Mr. Bray's affidavit states, in similar fashion, "Metcalf, Mayer, Faith, and Lucas all knew what was going on, that we were setting people up.  After deals were over, if any of them had questions or if there were any doubts as to what the story would be, we would all meet and get our stories straight.  Sometimes this involved deleting parts of audio and video records."  Paragraphs 12 through 15 purport to provide the basis for Mr. Bray's knowledge that Defendant Metcalf and others were aware that Mr. Bray was setting people up.

Paragraph 16 of Mr. Bray's affidavit asserts, in part, "Many times throughout this investigation, Metcalf, Mayer, Faith, and Lucas had reasons to know that the drug deals were not done with the people we claimed."  Mr. Bray further claims that "the local officers in particular, just wanted these folks off the streets and didn't care how it happened."

In paragraph 17, Mr. Bray reasserts his claim that Detective Metcalf and others knew of Mr. Bray's deception:

> I was there for all of this and I can tell you that there is simply no chance at all that Metcalf, Mayer, or Lucas could have avoided knowing what we were doing.  Based on their demeanor and expressions when we talked about the investigation, I could tell they knew what was really going on - they knew the people I was having deliver drugs were not really the targets they wanted to get. But as long as they got evidence that made it look like the targets were the ones dealing drugs, they did not care.  They would give me a name and we would make it happen.

Indeed, Mr. Bray's affidavit is devoted almost exclusively to assertions that law enforcement actively participated in an alleged conspiracy to frame Plaintiffs and others.

The Court declines to consider Mr. Bray's affidavit in view of the Sixth Circuit's sham affidavit doctrine, under which contradictory affidavits, *i.e.*, affidavits of party that directly

contradict prior sworn testimony, are inadmissible to defeat summary judgment.   The Sixth Circuit has held that a party cannot file an affidavit, after a motion for summary judgment has been made, which contradicts his earlier sworn testimony.  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (concerning prior sworn deposition testimony).  When deciding the admissibility of an affidavit at the summary judgment stage, the court first determines whether the affidavit directly contradicts the prior sworn testimony.  *Aerel, S.R.L. v. PCC Airfoils*, *LLC.*, 448 F.3d 899, 908 (6th Cir. 2006).  When the statements are contradictory, and no justifiable explanation is given for the contradiction, the affidavit should be stricken. *Id*.

Here, Mr. Bray's affidavit directly contradicts his prior sworn testimony at Special Agent Lucas' criminal trial.  As set forth above, Mr. Bray testified under oath at trial that no law enforcement officers, including Special Agent Lucas and Detective Metcalf, conspired with him to fabricate evidence against targets of the Mansfield operation.  Mr. Bray testified that he previously falsely reported a conspiracy between law enforcement and himself because he thought that it might somehow get him out of the trouble he faced after the 2007 shooting. Specifically, Mr. Bray testified:

> **Q.  During your testimony, today, sir, you talked about your use of stand-ins, correct?**
>
> **A.  Yes**.
>
> **Q.  And you indicated – today I believe you're indicating that the stand-in situation was done by you and you alone, correct?**
>
> **A.  Yes, sir, it was.**
>
> **Q.  Okay.  But initially, when you met with the government, you told them that Lucas was involved in each and every stand-in situation, isn't that true?**

**A.  Yes.  Yes, sir.**

**Q.  Why would you do that, sir?**

**A.  Again, I was trying to get myself out of trouble, so I was lying, sir.**

Q.  Isn't it true, sir, that when you first met with Mr. Warner, Webb's attorney, that you told Mr. Warner that the prosecutor, Mr. Serrano, was involved in all of this?  Isn't that true, sir?

A.  I don't recall that, sir.

**Q.  Now, you do agree, sir, that when you were making these allegations, you were making these allegations specifically about Mr. Lucas and not any of the other agents and cops, correct?**

**A.  That's not correct.**

Q.  You also made allegations against the rest of them?

A.  I think I made allegations against Jamaal.

Q.  What did you – now, when you say "Jamaal," you're talking about detective Ansari?

A.  Yes.

Q.  Okay.  And would you agree, sir, he's a detective with the Cleveland Police Department?

A.  I would agree to that now, yes.

Q.  Okay.  And but he was assigned to DEA and their task fore, correct?

A.  Yes.  I thought he was DEA.

Q.  Okay.  And during the Mansfield deals, sometimes Lucas would be in the care with you undercover, and sometimes Mr. Ansari, correct?

A.  Yes, sir.

Q.  Okay.  So you made false allegations against Mr. Ansari, also, correct?

9

A. Yes.  Again I was trying to get myself out of trouble.

Q. Okay.  What false allegations did you make against him?

A. I don't recall.

**Q. Did you make any false allegations against any of the Richland County people?**

**A. I don't recall**.

**Q. Didn't you make false allegations against Mr. Metcalf?**

**A. I don't recall**.

Q. All right.

**A. I was lying at the time so I don't recall.**

Q. Sir, at what point did you have your conversion?

A. Excuse me?

Q. Well, you were lying, right?

A. Yes.

**Q. And now you're not lying?**

**A. Yes.**

*See* Case No. 1:09CR00222, ECF #108 PageID #1815, ln. 1  to #1817, ln. 8.  Thus, Mr. Bray's affidavit stating that Defendant Metcalf and other law enforcement officials knew about his fabrication of evidence is squarely contradictory to his prior testimony that he acted alone. Plaintiffs have not provided any persuasive explanation for the contradiction. Accordingly, Mr. Bray's affidavit is not admissible to defeat summary judgment.

Even assuming that there was no *direct* contradiction between Mr. Bray's affidavit and

10

his trial testimony (which there clearly is), Mr. Bray's affidavit is inadmissible because it attempts to create a sham fact issue.  *Aerel*, 448 F.3d at 908 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986) (setting forth various factors to determine whether an affidavit attempts to create a sham issue of fact)). One of the factors to consider in determining whether the affidavit tries to create a sham fact issue is whether the affiant was cross-examined during earlier testimony. *Aerel*, 448 F.3d at 909.  This factor matters, because a party who is cross-examined but nevertheless offers unequivocal testimony, only to be contradicted by a later affidavit, has indeed tried to create a sham fact issue.  *Id.*  Mr. Bray was cross examined extensively at Special Agent Lucas' trial.  Still, he maintained that the fabrication of evidence was orchestrated solely by him.  As is evident from the Lucas trial transcript, Mr. Bray's position at the time of trial was that he acted alone and without the participation of law enforcement in framing targets of Operation Turnaround.  Indeed, the transcript reflects Mr. Bray's admission that his lies were so extensive that he could not  remember with any certainty or completeness what his false accusations were, or which officers he falsely accused.  Thus, Mr. Bray's subsequent affidavit testimony in this case, in which he claims that law enforcement – and, specifically, Richland County law enforcement – conspired with him to manufacture evidence during the Mansfield operation, can only be considered an attempt to manufacture a sham issue of fact.  The sham affidavit is therefore stricken, and will not be considered on summary judgment.

Although the Sixth Circuit's exclusion of contradictory or sham affidavits is applied most frequently against the party or parties attempting to avoid summary judgment, the doctrine's purpose can only be served by applying the rule equally to Mr. Bray, who, while not defending

11

summary judgment, was a party when his affidavit was sworn.[2]  The purpose of the sham

affidavit rule is to enforce the Supreme Court's edict that only a "genuine" issue of material fact

may overcome summary judgment.  *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247

(3d Cir. 2007).

As the *Jiminez* court discussed, the Supreme Court in *Anderson v. Liberty Lobby*

established the precept of summary judgment practice that the "mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff." *Jiminez*, 503. F.3d at 253 (citing *Liberty

Lobby*, 477 U.S. 242, 252 (recognizing the trial judge's power to grant summary judgment on

disputed records)).  In *Liberty Lobby*, the Supreme Court recognized that there is a distinction

between determining credibility and or weighing the evidence (both of which are impermissible

at the summary judgment stage), and determining whether there is a genuine issue of trial.

Indeed, the Supreme Court stated, "it is clear enough from our recent cases that at the summary

judgment stage the judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*,  477 U.S.

---

[2]Although Rule 56 does not prescribe how the trial court should regard the evidentiary value of contradictory affidavits at the summary judgment stage, the sham affidavit doctrine has emerged from a long line of court decisions, and has been adopted in some form by every federal court of appeals. *See Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 577-78 (2d Cir. 1969); *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 484, 498 (Fed. Cir. 1992); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Reid v. Sears Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Albertson v. T.J. Stevenson Co.*, 749 F.2d 223, 228 (5th Cir. 1984); *Van T. Junkins & Assocs. v. U.S. Indus. Inc.*, 736 F.2d 656, 657-59 (11th Cir. 1984); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364-65 (8th Cir. 1983); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir. 1975).

at 249.  It is the Supreme Court's election of the term "genuine issue" of fact rather than *any* issue of fact that lends support to the sham affidavit rule – and its application to Mr. Bray's affidavit – as a necessary tool for determining whether an authentic issue of fact truly exists.  In explaining the term "genuine issue" of fact, the *Liberty Lobby* Court recognized the trial judge's function at the summary judgment stage of separating the genuine issues from the counterfeit ones, stating, "There is no requirement that the trial judge make findings of fact.  The inquiry performed is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Id.* at 250.  It is this determination that allows a trial judge to disregard contradictory affidavits.

A sham affidavit (like Mr. Bray's) is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story, or is willing to offer a statement not for its truth, but solely for his own purposes, which may or may not include a desire to defeat summary judgment. *See Jiminez*, 503 F.3d at 253.  Therefore, without determining which version of the affiant's story is true, the trial judge's authority extends to holding that a sham affidavit cannot raise a genuine issue of fact when it varies from earlier sworn testimony.  Indeed, as the *Jiminez* court observed, no reasonable jury could accord that affidavit evidentiary weight.  *Id*.

As previously stated, Mr. Bray's affidavit directly contradicts his prior sworn testimony at Special Agent Lucas' criminal trial that no law enforcement officers conspired with him to frame targets of Operation Turnaround.  The affidavit's value is limited to showing that Mr. Bray cannot maintain a consistent story, particularly regarding law enforcement's knowledge of his setting up individuals during the Mansfield operation.  Indeed, Mr. Bray originally stated that law

13

enforcement knew of his misdeeds.  Then, at Special Agent Lucas' trial, he changed his story, testifying unequivocally that law enforcement was not involved in his fabrication of evidence, and that he initially lied about law enforcement's involvement in hopes of avoiding some of the fallout from the 2007 shooting.  Now, Mr. Bray has flip-flopped again, testifying in his affidavit that law enforcement knew that he was setting people up and actively conspired to frame individuals as part of Operation Turnaround.  Without considering which version of Mr. Bray's ever-changing story is true, the Court holds that Mr. Bray's sham affidavit is inadmissible at the summary judgment stage, because no reasonable jury could consider it to have any evidentiary value.

### A. **Plaintiff Ballard's Fourth Amendment Claims Against Detective Metcalf Fail As A Matter Of Law**

Without Mr. Bray's affidavit, the record lacks evidence that Detective Metcalf committed any Fourth Amendment violation against Mr. Ballard.  In the January 4, 2012 Memorandum Opinion and Order (ECF #151), this Court granted Defendant Metcalf's Motion for Summary Judgment on the issue of qualified immunity with the exception of the Fourth Amendment false arrest, malicious prosecution, and fabrication of evidence claims of plaintiffs Lowestco Ballard and Dwayne Nabors.  Concerning Mr. Ballard's claims, the Court denied summary judgment because there was some evidence that Detective Metcalf had prior dealings with Mr. Ballard, and therefore possibly should have known that the individual under video surveillance during the relevant September 9, 2005 drug transaction, and later identified by Special Agent Lucas and Mr. Bray, was not Lowestco Ballard (indeed, it appears uncontested at the summary judgment stage of this litigation that the individual involved in the transaction was Darren Transou, not Mr.

14

Ballard).  The Court held:

> The plaintiffs assert also that Detective Metcalf had prior dealings
> with Lowestco Ballard, and therefore should have known that the
> individual under surveillance during the subject drug transaction,
> and later identified by Special Agent Lucas, was not Lowestco
> Ballard.  Viewing this evidence in the light most favorable to
> plaintiffs, Detective Metcalf possibly  had reason to believe that
> Special Agent Lucas's identification of Mr. Ballard was erroneous.
> Detective Metcalf's reliance on that identification therefore was
> not objectively reasonable.

(ECF #151, p. 27.)

The possibility that Detective Metcalf could have corrected Special Agent Lucas'

identification of Mr. Ballard is premised in major part upon the assumption that Detective

Metcalf may have viewed the videotape of the drug transaction prior to Mr. Ballard's trial.

According to Detective Metcalf's Declaration attached to his Motion for Summary Judgment,

Detective Metcalf did not participate in the visual surveillance of the September 9, 2005

transaction, and did not view the video prior to trial.[3]  Although Plaintiffs generally allege that

Defendant Metcalf should have been able to identify Mr. Ballard from prior experience, the only

evidence that Plaintiffs offer to suggest that Detective Metcalf may have viewed the videoed

transaction prior to Mr. Ballard's trial is Mr. Bray's July 11, 2012 affidavit, which has been

stricken for the reasons discussed above.   Thus, there is no factual challenge to Detective

Metcalf's assertion that, prior to Mr. Ballard's trial,  he did not view the video taken by other

---

[3]Plaintiffs claim that Detective Metcalf's Declaration should not be considered because
the Declaration is "self-serving."  Plaintiffs' argument is not well-taken.  Merely claiming that
evidence is self-serving does not mean that the Court may disregard it, or that it is insufficient.
*Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2012).  A self-serving affidavit is
still evidence.  *Niemi v. NHK Spring Co.*, 543 F.3d 294, 300 (6th Cir.2008) ("[Plaintiff's]
affidavit, albeit arguably self-serving, is not 'no evidence.' ")

officers, and was unaware of its content.[4]

Moreover, Plaintiffs have failed to suggest any reason why Detective Metcalf was obligated to review a video taken by other officers.  Certainly, Plaintiffs have not offered any authority to show that failure to review a video is a violation of Constitutional magnitude.

Further, Detective Metcalf, who conducted audio surveillance during the subject drug deal, expressly denies having knowledge sufficient to identify either Lowestco Ballard or Darren Transou by voice alone.  There is no evidence to the contrary.

In light of the foregoing, the record lacks any facts to support a cognizable false arrest claim by Lowestco Ballard against Detective Metcalf under 42 U.S.C. § 1983. *See Scott v. City of Cleveland*, 555 F. Supp. 2d 890, 896 (N.D. Ohio 2008) (mere presence at the scene of an alleged Fourth Amendment violation, without showing direct responsibility for the action, is not enough to give rise to Section 1983 liability). In the Court's prior ruling (ECF #151), this Court denied Detective Metcalf qualified immunity on Mr. Ballard's false arrest claim.  A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.  *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005).

Because a facially valid warrant issued by a magistrate (like the warrant here) provides a complete defense to a claim that probable cause was lacking, *id.*, a plaintiff alleging false arrest must demonstrate by a preponderance of the evidence that, in order to procure the warrant, a law enforcement official "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements were material, or

---

[4]Plaintiffs are inconsistent when they urge the Court to disregard Defendant Metcalf's Declaration because he is an admitted liar, when Plaintiffs seek to rely on the affidavit of Mr. Bray, an admitted liar.

necessary, to the finding of probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2012).

Here, there is no evidence that Detective Metcalf knowingly and deliberately, or with a reckless disregard for the truth, made any false statements or omissions concerning Mr. Ballard. The evidence is that Detective Metcalf: (1) did not participate in video surveillance of the relevant drug transaction; (2) did not view the video of the transaction prior to Mr. Ballard's trial; (3) conducted audio surveillance of the deal only; (4) did not have the ability to identify Mr. Ballard or Mr. Transou by voice alone; (5) did not identify Mr. Ballard as having participated in the deal; (6) did not testify before the grand jury; and (7) did not make any recommendations regarding the prosecution of Mr. Ballard.  Further, Plaintiffs have not offered any reason why Defendant Metcalf was obligated to review the video evidence taken by other officers.  Under the circumstances, Detective Metcalf reasonably relied on the identification of Mr. Ballard made by Special Agent Lucas.  Accordingly, Detective Metcalf is not guilty of any Fourth Amendment false arrest violation relating to the identification of Lowestco Ballard.

Additionally, any Fourth Amendment malicious prosecution claim brought by Mr. Ballard against Detective Metcalf fails.  To succeed on a malicious-prosecution claim under Section 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove four things: (1) a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty as understood in our Fourth Amendment jurisprudence, apart from the initial seizure, and (4) the criminal proceeding was resolved in the plaintiff's

17

favor.  *See Sykes*, 625 F.3d at 308-09 (holding that a demonstration of "malice" is not required to prevail on a Fourth Amendment claim for malicious prosecution).

Here, Plaintiff Ballard fails to demonstrate the first and second factors.  First, Detective Metcalf did not testify before the federal grand jury concerning Lowestco Ballard.  Nor did he make any recommendations regarding the prosecution of Lowestco Ballard.  There is no showing that he made, influenced, or in any way participated in the decision to prosecute Lowestco Ballard.

Second, given the Court's determination that probable cause existed for Mr. Ballard's arrest, probable cause existed for Mr. Ballard's prosecution.  There is no evidence of anything that occurred post-arrest and leading up to trial that destroyed probable cause for prosecution.

For all of the foregoing reasons, Mr. Ballard's Fourth Amendment claims against Detective Metcalf fail as a matter of law.  Detective Metcalf is entitled to summary judgment on those claims.

### B.  Plaintiffs' *Monell* Claims Against Richland County Fail As A Matter Of Law

Plaintiffs' *Monell* claims against Richland County also fail as a matter of law.  Under *Monell*, a municipality is liable under Section 1983 only if the plaintiff shows it engaged in a "policy or custom" that was the "moving force" behind each officer's deprivation of that plaintiff's rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978).  As the Sixth Circuit emphasized in *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000), the "conclusion that no officer-defendant ha[s] deprived the plaintiff of any constitutional right a fortiori defeats [a] claim against the [government entity] as well."  *Id.* at 879 (citing *City of Lost Angeles v. Heller*, 475 U.S. 796, 799); *see also Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)

18

("If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983")(internal citations omitted).

As an initial matter, Plaintiffs mistakenly argue that Richland County may be liable under *Monell* for the unconstitutional acts of the confidential informant, Jerrell Bray.  Yet Plaintiffs fail to cite any supporting authority.  Instead, the decisions Plaintiffs cite are criminal cases that address whether evidence must be suppressed because a search and seizure conducted by a private actor was directed by, or for the benefit of, the government.   Plaintiffs cite no authority on which to conclude that a private party who is treated as a "state actor" for purposes of the Fourth Amendment in a criminal case (or even in a Section 1983 case) may also be treated as a "state actor" for the purpose of establishing a *Monell* claim.  Indeed, the ubiquitous feature of *Monell* cases is that they involve one or more municipal employees.  This makes sense when considering that the legal analysis of a *Monell* claim is specifically meant to displace the common-law doctrine of respondeat superior which ordinarily might apply.  And, as a factual matter, there is no evidence that the Richland County Sheriff's Office considers its confidential informants to be employees or agents.  Thus, a *Monell* claim cannot be based on the actions of Jerrell Bray.

In this ruling, and this Court's previous Order, the Court has determined that the only constitutional violations by *employees* of Richland County that *may* have occurred in this case are those which Defendant Metcalf allegedly committed with respect to Mr. Nabors.  It  is axiomatic that a municipality cannot be held liable for developing a policy or custom that led to a constitutional violation in situations where a constitutional violation did not occur.  There can be no causal link between municipal policy and constitutional tort when the constitutional tort does

19

not exist. Accordingly, the remaining claims of Mr. Nabors against Detective Metcalf form the sole basis on which Richland County conceivably could be liable under *Monell*.[5]

The Sixth Circuit has recognized several ways to establish a *Monell* violation. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). Additionally, a plaintiff may establish *Monell* liability by showing that the municipality ratified its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *See Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989). A necessary factor in all of these considerations is that, for a *Monell* claim to be viable, the municipal action (or inaction) must have been the moving force behind the constitutional harm. *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694).

Mr. Nabors cannot establish a *Monell* claim against Richland County through any of these means. First, even assuming for the sake of argument that Mr. Nabors can prove that his constitutional rights were violated in this case, he cannot, and has not attempted to, point to any "policy statement, ordinance, regulation, or decision officially adopted and promulgated," *Monell*, 436 U.S. at 690, that mandated, encouraged, or authorized Detective Metcalf's alleged unconstitutional acts. In fact, the Amended Complaint lacks any allegation that could support such a claim.

---

[5]Detective Metcalf does not concede that he violated any Plaintiff's constitutional rights.

20

Second, respecting a final decision-maker, the Sixth Circuit has made clear that the "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policy maker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

There is no evidence here, and no allegation in the Amended Complaint, that Detective Metcalf had this degree of authority in this case.  Although Sheriff Sheldon, to whom Detective Metcalf reported,  undoubtedly is a "final policymaker" for Richland County, there is no evidence that he was involved in any way with the alleged actions giving rise to Mr. Nabors' claims.  Indeed, it appears that, even when given two months for discovery, Plaintiffs chose not to depose Sheriff Sheldon to probe his involvement.  Apparently, Plaintiffs did not even depose the Richland County Sheriff's Office deputies to uncover who in Richland County knew what about Mr. Bray's activities.  This means that, other than the speculation that appears throughout the Plaintiffs' briefs about what – with the benefit of hindsight – Plaintiffs believe Richland County officials should have known, there is no basis for Plaintiffs to argue that Sheriff Sheldon or any Sheriff's Office employee knew of Mr. Bray's fabrication of evidence against any Plaintiff.  Even assuming *arguendo* that some Richland County Sheriff's Office employee knew or suspected that Mr. Bray was framing individuals during the Mansfield operation, there is absolutely no evidence that any such knowledge or suspicion was passed up the chain of

command.[6]

Nor is there any basis for concluding that Detective Metcalf had inadequate training in the use of confidential informants. Claims for lack of training or supervision have been described as theories of "municipal inaction." *Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008). It is not enough for a plaintiff merely to allege either (1) that an officer's training and supervision were inadequate, or (2) that the officer would not have violated the plaintiff's constitutional rights had he or she been given more or better training and supervision. *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). Rather, to succeed on a failure to train or supervise claim, a plaintiff must prove three things: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to, or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

Deliberate indifference is a critical element of claims of "municipal inaction." *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2007). This is a stringent standard, and, as the *Arendale* court stated, "the evidence must demonstrate more than just 'a collection of sloppy, or even

---

[6]Plaintiffs also neglect to recognize that, when almost all of the alleged deficiencies in the investigation occurred, the DEA and Special Agent Lucas were at the helm. By that time, Messrs. Faith, Mayer, and Metcalf were acting pursuant to the DEA's protocols and assurances regarding paperwork and the handling of confidential informants. The Sheriff's Office did not participate in, review, or otherwise monitor the charges, indictments or prosecutions of individual suspects, except to the extent that the DEA or the United States Attorney requested it. Further, the U.S. Attorney's Office did not keep the Richland County Sheriff's Office updated on the criminal proceedings. And other than Detective Metcalf, no Richland County Sheriff's Office employee participated in or was present for any criminal proceeding that involved targets of Operation Turnaround. Accordingly, there is no evidence that any "final policymaker" of Richland County was aware of what was happening during the federal prosecutions.

reckless, oversights.'" *Arendale*, 519 F.3d at 600 (quoting *Doe v. Claiborne Cty.* 103 F.3d 495, 508 (6th Cir. 1996)).  Instead, "the record must show that the [defendant] consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct." *Id.* (internal quotation omitted).

Here, there is no evidence that Detective Metcalf's training was inadequate, or that Richland County showed "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388.  The Court has already noted Detective Metcalf's extensive training in such matters as surveillance, gangs, drugs, search and seizure, and chain of custody.  (ECF #151, p. 3 nn. 4-7).  The record also already contains evidence that the Sheriff's Office's custom and practice with respect to confidential informants was to (A) conduct a monitored phone call between the informant and the suspect to set up the drug transaction; (B) search the informant and his vehicle before the transaction; (C) maintain surveillance of the informant during the transaction; (D) search the informant and his vehicle after the transaction; and (E) debrief the informant, taking a statement, after the transaction.  *See, e.g.,* Case No. 09CR00222, ECF #116, PageID 2628-2630; ECF #119, PageID 3129-3131.  Furthermore, the evidence shows that Sheriff's Office employees had extensive in-the-field training on how to handle confidential informants before Operation Turnaround.  The Sheriff's Office had used confidential informants in hundreds of investigations, including those which involved making undercover purchases of contraband.  There is no evidence that, until Mr. Bray admitted to fabricating evidence, the Sheriff's Office was made aware of any formal complaints that one of its informants was fabricating evidence against individuals under investigation.  There is simply no legitimate basis for finding that Richland County was deliberately indifferent to the

23

constitutional rights of its citizens with respect to the use of confidential informants.

Further, there is no nexus between Detective Metcalf's alleged lack of training with respect to confidential informants and his purported unconstitutional activities in this case. Plaintiffs' allegation is not that Detective Metcalf was merely reckless or incompetent in his handling of Mr. Bray, but rather that Detective Metcalf deliberately lied and knowingly conspired with Mr. Bray and others to frame targets of Operation Turnaround. Yet, Plaintiffs have not explained how additional training would have prevented Detective Metcalf's dishonesty. Indeed, a law enforcement officer's choice to lie, fabricate evidence, or conceal exculpatory evidence would appear to be one that is made despite any training. Accordingly, it cannot be said that any lack of training or supervision of Detective Metcalf by Richland County "was closely related to or actually caused the injury," *Ellis*, 455 F.3d at 700, or that improved training or supervision would have prevented the alleged deprivations of Mr. Nabors' constitutional rights.

Similarly, any claim that Richland County failed to adequately supervise Detective Metcalf during his trial testimony against Mr. Nabors lacks merit. The testimony was given under the supervision of the United States Attorney. This Court has already determined that there is no evidence to suggest that the other Richland County Sheriff's Office Defendants knew or had any reason to know of Detective Metcalf's dishonest testimony, or were complicit in it in any way. (ECF #151, p. 27.) Thus, once again, there is no basis to determine that the supervision that Detective Metcalf received from Richland County was closely related to, or caused Mr. Nabors' alleged injuries. *Id*.

Next, there is no evidence that Richland County had a custom or policy of tolerating or acquiescing in constitutional violations. This, too, is a theory of inaction requiring proof of: (1)

24

the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice

on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct,

such that their deliberate indifference in their failure to act can be said to amount to official

policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal

link in the constitutional deprivation. *Thomas*, 398 F.3d at 429.  But, as stated, there is no

evidence of a clear and persistent pattern of illegal activity by Richland County's officers that

bears any similarity to Detective Metcalf's alleged violations in this case.  Even if such a pattern

existed, the evidence presented in Sheriff Sheldon's affidavit attached to the Motion for

Summary Judgment is that Richland County had no notice of it.  Furthermore, there is no

evidence that Richland County has acted with deliberate indifference in the face of such a

pattern, nor is there any reasonable basis for believing that Richland county somehow was the

"moving force" behind Detective Metcalf's (or Jerrell Bray's) alleged violations.

Lastly, Plaintiffs' allegation that Sheriff Sheldon "ratified" Detective Metcalf's actions

because he spoke favorably of Detective Metcalf at his sentencing hearing does not support a

*Monell* claim.  A municipality may be held liable under Section 1983 where the responsible law

enforcement official has "ratified" unconstitutional conduct by completely failing to investigate a

citizen's complaints of constitutional violations.  *Leach*, 891 F.2d 1241.  A *Monell* claim based

upon ratification of unconstitutional behavior is another inaction theory, requiring a plaintiff to

show not only that the investigation was inadequate, but that the flaws in the investigation were

representative of: (1) a clear and persistent pattern of illegal activity, (2) which the Department

knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that

the Department's custom was the cause of the constitutional deprivation here.  *Id.*

25

Plaintiffs fail to cite any authority that a single statement at a sentencing hearing constitutes "ratification" under *Monell*.  Richland County has provided evidence that no ratification occurred.  Providing false testimony is a violation of the Richland County Sheriff's Office policy.  When Detective Metcalf was accused of providing false testimony, Sheriff Sheldon decided to postpone disciplinary action until the federal criminal proceedings against Detective Metcalf concluded.  Detective Metcalf retired, however, before the investigation was final, and before any discipline could be imposed.  Furthermore, the subsequent ratification of Detective Metcalf's conduct clearly was not the moving force behind Detective Metcalf's alleged constitutional violations here.  Without evidence of ratification of similar conduct prior to Detective Metcalf's alleged violation, Plaintiffs' *Monell* claim based on alleged ratification falls short.  *Tomazic v. City of Cleveland,* 2006 U.S. Dist. LEXIS 65682 (N.D. Ohio Sept. 14, 2006) (Nugent, J.) ("Ratification of [the individual officer's] acts after the fact, even if it had happened, could not have been a direct cause of the shooting when it occurred"); *see also Phillips v. Stevens*, 2007 U.S. Dist. LEXIS 60215 (S.D. Ohio Aug. 16, 2007.)

26

## IV.  <u>CONCLUSION</u>

The Sixth Circuit has emphasized that "the plaintiff bears a heavy burden in proving municipal liability." *Thomas*, 398 F.3d at 432.  For the reasons stated, Plaintiff Nabors cannot make any viable *Monell* claim against Richland County.  Additionally, for the reasons explained above, Plaintiff Ballard's claims against Detective Metcalf fail as a matter of law.  Accordingly, the motions for summary judgment are GRANTED.

**IT IS SO ORDERED**

   <u>  s/Donald C. Nugent</u>
**DONALD C. NUGENT**
**UNITED STATES DISTRICT JUDGE**

**DATED:** <u>  October 22, 2012</u>